**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

DAVID C. MITCHELL            *
                               *
         v.                 *   Civil Action WMN-10-0337
                               *
KENTMORR HARBOUR MARINA, et al.   *
                               *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## <u>MEMORANDUM</u>

Plaintiff David C. Mitchell ("Mitchell"), t/o/u and t/u/o

Federal Insurance Company, sued Defendant Kentmorr Harbour

Marina ("Kentmorr") for breach of contract, negligence and

breach of bailment, and sued Defendant Sheep Dog Marine, LLC

("Sheep Dog"), for negligence.  The Defendants filed cross-

claims against each other for contribution and indemnification.

A bench trial was held on October 24, 2011, and the parties have

filed proposed conclusions of law.  The Court has heard the

evidence, reviewed the exhibits, considered the materials

submitted by the parties, and had the benefit of the arguments

of counsel.  The Court now issues this Memorandum of Decision as

its findings of fact and conclusions of law in compliance with

Rule 52(a) of the Federal Rules of Civil Procedure.

For the following reasons, the Court finds Kentmorr liable

for breach of contract and negligence and awards Plaintiff

$54,861.27 plus pre-judgment interest.

## I. FINDINGS OF FACT

1.  In 2004, Plaintiff bought a forty-foot Cruiser called "A
    Portrait," which he insured with Federal Insurance Company,
    a member of Chubb Group of Insurance Companies.

2.  From 2006 to 2008, Plaintiff kept A Portrait at the
    Annapolis Yacht Basin when it was in use, and then stored
    it on land for the winter at Kentmorr Marina.

3.  During this time Plaintiff was a part owner of Kentmorr.
    Kentmorr had two employees: Richard "Dick" Lean, the
    General Manager, and Steve Smith.

4.  Kentmorr did not have a service department that repaired,
    winterized or commissioned boats.  Kentmorr rented out
    slips, provided on-land storage facilities, hauled boats,
    launched boats, and assisted owners in finding contractors
    to service their boats as needed.

5.  It is undisputed that, during the relevant time period,
    Plaintiff had a contract with Kentmorr for the hauling,
    storage, and launch of A Portrait.

6.  In fall 2007, Plaintiff delivered his boat to Kentmorr for
    hauling (removing the boat from the water) and winter
    storage.  The boat was in good condition when delivered.

7.  In November 2007, Eric Groves, the owner and sole employee
    of Sheep Dog, winterized A Portrait.  Winterization
    involves draining all water out of the boat's systems and
    replacing it with anti-freeze.  As part of this process,

Groves opened the sea strainer caps to remove and clean the sea strainer basket and to run antifreeze through the cooling system.  After completing the winterization process, Groves left the portside sea strainer cap loosely fitted.  Testimony from Plaintiff's expert, Matthew Schmahl, confirmed that it is within the standard of care to leave sea strainer caps loosely fitted after winterization to bleed air.  Sheep Dog sent the bill for its services to Kentmorr, which forwarded the bill to Plaintiff.  Plaintiff paid Sheep Dog directly.

8. During the winter of 2007 to 2008, Kentmorr stored A Portrait on land.  The boat was shrink-wrapped by another contractor, Top Knot, and then put up on blocks.

9. Plaintiff had access to A Portrait while it was in storage, and visually inspected its exterior whenever he came to the marina, approximately 3 or 4 times over the winter.  Though he could have, Plaintiff never boarded the boat while it was in storage.  Plaintiff also held on to the keys for A Portrait and did not turn them over to Kentmorr or Sheep Dog.

10. In March 2008, Plaintiff contacted Kentmorr and asked that A Portrait be launched.  Launching a boat involves taking a boat off the on-land blocks and using a travel lift to put it in the water.  Once in the water the boat is tied in a

slip.  Expert testimony established that when a party
launches a boat, that party is responsible to ensure that
the boat is sound and not taking on water once adrift.

11. Launching a boat is not the same as commissioning, or
"dewinterizing," the boat.  A boat is typically
commissioned after it is launched.

12. After Plaintiff contacted Kentmorr to launch the boat, Dick
Lean contacted Top Knot to remove the shrink wrap, detail
the boat, and replace the zincs.  Dick Lean also emailed
Groves at Sheep Dog to notify him that Kentmorr was
preparing to launch A Portrait and asked "[i]s there
anything we need to know prior to launching?  Did that boat
have drain plugs???"  Pl. Ex. 8.  Groves replied only that
he had bypassed the water heater when the boat was
winterized, and that he could come by and put the water
system back together.  Groves did not mention anything
about sea strainer caps that needed to be tightened.

13. Groves went to the marina sometime prior to the launch with
the intention of putting the water system back together,
but when he arrived the marina gates were closed and he
could not enter.  He did not have any further communication
with Kentmorr or Plaintiff and was not hired by either
party to commission A Portrait, either prior to or after
the launch.

14. Kentmorr employees Lean and Smith launched A Portrait on April 9, 2008.  Lean visually inspected the exterior of the vessel to make sure there were no punctures or drain plugs, and helped guide the vessel into the travel lift, which was operated by Smith.  Once the vessel was in the water, Lean and Smith used hooks and lines to move it from the lift into a slip.  Neither Lean nor Smith boarded the boat or visually inspected the interior of the boat or engine compartment before or after the launch.  When Lean left the marina at the end of the day, A Portrait was still afloat.

15. When Lean arrived at the marina the next morning he checked on A Portrait and noticed that it was partially submerged.

16. Expert testimony established that the undisputed cause of the partial submersion was a loosely fitted sea strainer cap, through which water flowed into the bilge.  The sea strainer cap was not damaged in anyway and functioned satisfactorily once tightened.

17. Undisputed expert testimony established that if someone had boarded the vessel once afloat and done a cursory inspection, it would have been both visually and audibly obvious that A Portrait was taking on water because of the large quantity of water coming through the sea strainer into the bilge space.

18. The parties have stipulated that as a result of the partial

    submersion, Plaintiff sustained $54,861.27 in damages:

    $51,361.27 paid under his insurance policy plus a $3,500

    deductible.

19. Because of the damage sustained after the launch, Kentmorr

    did not charge Plaintiff a fee for launching A Portrait.

## II.   CONCLUSIONS OF LAW

1.  As the claims in this lawsuit arise out of the maintenance,

    storage and launch of A Portrait, a recreational marine

    vessel, at a marina on navigable waters, maritime law

    applies to all claims.  See Sisson v. Ruby, 497 U.S. 358,

    367 (1990).

### Breach of Contract

2.  A maritime service contract, such as a contract for the

    storage and launch of a vessel, includes an obligation that

    "one who undertakes to perform a service does so with the

    implicit agreement to perform in a workmanlike fashion."

    Commercial Union Ins. Co. v. Bohemia River Assoc., Ltd.,

    855 F.Supp. 802, 806-807 (D. Md. 1991) (citing T.

    Schoenbaum, Admiralty and Maritime Law, § 4-2, at 136

    (1987)).

3.  Therefore, when Kentmorr entered into a contract with

    Plaintiff for the haul, storage, and launch of A Portrait,

the contract included an implied warranty of workmanlike
performance.

4. The implied warranty of workmanlike performance requires
   that the party providing the contracted marine services do
   so in a diligent, workmanlike manner, and exercise "at
   least" ordinary and reasonable care.  <u>Garrett v. United
   States Lines, Inc.</u>, 574 F.2d 997, 1000-1001 (9th Cir.
   1978).

5. Undisputed expert testimony established that the use of
   reasonable care when launching a vessel includes boarding
   the vessel and completing a cursory inspection once in the
   water to determine that the vessel is sound and not
   leaking.

6. Kentmorr breached its warranty of workmanlike conduct when
   it launched A Portrait and failed to perform a cursory
   inspection for leaks or other obvious defects.

7. Even though Plaintiff was aware that marina employee Lean
   did not have technical expertise regarding boat mechanics,
   Kentmorr is a marina in the business of launching boats and
   so does not escape its duty to use reasonable care,
   including conducting a cursory inspection by boarding the
   boat after launch, when engaged in its business.

8.  Therefore Kentmorr is liable for breach of the implied
    warranty of workmanlike conduct found in its contract with
    Plaintiff.

**Negligence**

9.  The elements of negligence in a maritime cause of action
    are essentially the same as the elements for land-based
    negligence under the common law.  Evergreen Int'l, S.A. v.
    Norfolk Dredging Co., 531 F.3d 302, 308 (4th Cir. 2008).
    Plaintiff must prove by a preponderance of the evidence
    that (1) the defendant owed a duty to the plaintiff, (2)
    the defendant breached that duty, (3) the breach was a
    proximate cause of the resultant injury, and (4) plaintiff
    sustained an actual injury.  Desmond v. Holland American
    Cruises, 1981 AMC 211 (S.D.N.Y. 1981).

10. As established by expert testimony, Kentmorr, as the party
    launching the vessel, had a duty to act with reasonable
    care and, once A Portrait was in the water, to go aboard
    and complete a cursory inspection to determine that the
    vessel was sound and not leaking.  This is consistent with
    the fact that when an owner requests that his boat be
    launched, he expects it to be put in the water and stay
    afloat, so the launching party has an obligation to make
    sure that once a vessel is in the water there are no

obvious defects causing it to take on water, even if the owner does not explicitly request such an inspection.

11. Because Kentmorr is a marina in the business of launching boats, it does not escape the duty of reasonable care even though Plaintiff was aware that employee Dick Lean was not knowledgeable about boat mechanics.

12. Kentmorr breached its duty when the employees launching the boat failed to board the vessel or undertake any inspection once A Portrait was in the water.

13. This failure to undertake a cursory inspection after launching the vessel proximately caused the partial submersion of A Portrait as a cursory inspection would have revealed the obvious and audible incursion of water through the sea strainer cap.

14. The parties have stipulated that Plaintiff suffered actual damage to his property.

15. Kentmorr is liable in negligence because Plaintiff has proven by a preponderance of the evidence all of the elements of negligence.

16. Sheep Dog's sole duty was to use reasonable care when winterizing the vessel.  Sheep Dog did not have a duty to respond to the March 2008 email and advise Kentmorr that the sea strainer cap may have been open because Sheep Dog was not hired to launch or commission the vessel.  It would

be unreasonable to require Sheep Dog, whose duty to

Plaintiff ended after winterization was complete, to reply

to this type of email with a checklist of valves, caps,

etc. to check prior to another party launching the vessel.

Furthermore, the loosely-fitted cap was easily discoverable

by any party hired to launch or commission the vessel.

17. Sheep Dog did not breach its duty to use reasonable care

when winterizing the vessel because, even though it left a

sea strainer cap loosely-fitted, expert testimony

established that doing so is within the standard of care

for performing winterization.

18. As Plaintiff has not proven by a preponderance of the

evidence the elements of negligence as against Sheep Dog,

Sheep Dog is not liable.

**Breach of Bailment**

19. Generally, a contract for the storage or maintenance of a

boat constitutes a bailment.  Commercial Union Ins. Co. v.

Bohemia River Assocs., 855 F.Supp. 802, 805 (D. Md. 1991).

20. A bailment typically requires exclusive control by the

bailee.  Id.

21. Though some Courts have relaxed the exclusivity requirement

when an owner has access to a boat in dry storage, see

Hicks v. Tolchester Marina, Inc., 1984 AMC 2027 (D. Md.

1983), "the majority of admiralty cases consider the

bailee's exclusive right to possess the boat a major factor

which points in the direction of an admiralty bailment."

Commercial Union, 855 F.Supp. at 805.

22.  As Plaintiff and his contractors had access to A Portrait

while it was in storage and Plaintiff maintained possession

of the keys, this Court holds that there was no bailment,

and therefore no breach of bailment.

**Prejudgment Interest**

23. The Court has discretion to determine whether or not to

award prejudgment interest in a maritime case, though there

is a strong tendency in favor of making such awards.

Robert C. Herd & Co. v. Krawill Machinery Corp., 256 F.2d

946, 952 (4th Cir. 1958).  The Court should consider the

circumstances of the particular case and determine whether

an award of interest is consistent with the demands of

equity and justice, in so far as providing full and fair

compensation, including for loss of use of his money, to

the injured plaintiff.  Id.; Pine St. Trading Corp. v.

Farrell Lines, Inc., 364 A.2d 1103, 1112 (Md. 1976).

24. Defendants have not made any arguments that an award of

prejudgment interest would be inequitable, nor is the Court

aware of any reason for denying such award, such as an

unreasonable delay or an unreasonable settlement position

taken by Plaintiff.

25. This Court looks to Maryland state law to provide guidance
    as to the prevailing legal interest rate.  See Fed. Sav. &
    Loan Ins. Corp. v. Quality Inns, Inc., 876 F.2d 353, 359
    (4th Cir. 1989).  The Constitution of Maryland provides
    that the legal rate of interest "shall be Six per cent per
    annum, unless otherwise provided by the General Assembly."
    Md. Const. Art. III, § 57.  Though the General Assembly has
    specified that the post-judgment interest rate is ten per
    cent, it has not modified the interest rate for pre-
    judgment interest.  Id.; see also Crystal v. West &
    Callahan, Inc., 614 A.2d 560, 572 (Md. 1992).

26. Therefore, this Court will award prejudgment interest, from
    April 9, 2008, at six per cent per annum.

## III. CONCLUSION

For the reasons stated above, the Court finds Kentmorr
wholly liable for $54,861.27 plus pre-judgment interest, from
the date of loss, at a rate of six per cent per annum.  The
Court will issue a separate Order.

_____/s/_____
William M. Nickerson
Senior United States District Judge

November 17, 2011